UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NAVTEJ BHANDARI and
ESTATE OF XEE YANG,

      Plaintiffs,

      v.                                        Case No. 23-C-986

OUTAGAMIE COUNTY,
JAMES STORDOCK, and
THOMAS VAN HORN,

      Defendants.

---

## DECISION AND ORDER DENYING
## DEFENDANTS' MOTION TO DISMISS

---

      This case arises out of the tragic death of Xee Yang, who jumped or fell out of a moving vehicle as she was being transported to the Winnebago Mental Health Institute. Plaintiffs Navtej Bhandari and the Estate of Xee Yang have sued Defendants Outagamie County, James Stordock, and Thomas Van Horn, asserting claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(A), and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; a civil rights claim under 42 U.S.C. § 1983 for a violation of Yang's due process rights secured by the Fourteenth Amendment; a state law wrongful death claim pursuant to Wis. Stat. § 345.05(2); and a state law indemnification claim pursuant to Wis. Stat. § 845.46. The court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367. Before the court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion will be denied.

**LEGAL STANDARD**

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022). Rule 8 requires a pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding such a motion, the court must accept as true the well-pleaded factual allegations of the complaint and draw reasonable inferences in favor of the plaintiff. *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F. 4th 517, 523 (7th Cir. 2022). To survive a Rule 12(b)(6) motion, a complaint must have factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a plaintiff is not required to plead detailed factual allegations, he must plead "more than labels and conclusions." *Id.* Thus, a simple, "formulaic recitation of the elements of a cause of action will not do." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570) (internal citations and quotation marks omitted); *see also Yasak v. Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi.*, 357 F.3d 677, 678 (7th Cir. 2004).

**ALLEGATIONS CONTAINED IN THE AMENDED COMPLAINT**

Navtej Bhandari is the widower of Xee Yang, whose death gives rise to this action, and the personal representative of the Estate of Xee Yang. Am. Compl. ¶¶ 301–03, Dkt. No. 11. On May 29 through May 30, 2022, officers of the Grand Chute Police Department received several reports of Yang's psychotic and uncontrollable behavior, trying to hurt herself by stabbing her own throat

with a fork, acting violently towards her family members, and escaping her own home upon the arrival of police officers. *Id.* ¶¶ 402–05. Her family also reported that Yang was making threatening statements such as "kill them all." *Id.* ¶ 407.

On May 30, 2022, based on her dangerous conduct, Yang was taken to St. Elizabeth Hospital in Appleton by officers of the Grand Chute Police Department, as the first step in an emergency detention under Chapter 51 of the Wisconsin Statutes, while representatives of the Outagamie Crisis Center sought a mental health placement for her. *Id.* ¶¶ 401, 408. While she was in the emergency room, Yang's condition remained volatile. Apparently thinking she was in a police station, Yang continued yelling and screaming, and seemed agitated, confused, angry, aggressive, and frightened. *Id.* ¶¶ 410–16. At one point, as Yang appeared to calm down, a nurse returned a necklace that had been taken from Yang for her own safety. Yang immediately placed it in her mouth and swallowed it. *Id.* ¶ 417. For her safety, as well as that of others, and even though sedatives had been administered to her, Yang was physically restrained in her bed by having both of her arms handcuffed to the bedrails. *Id.* ¶ 418.

Yang was assessed by the mental health staff at St. Elizabeth's Hospital and was determined to be suffering from acute psychosis. *Id.* ¶ 419. The decision was made to have Yang admitted to the Winnebago Mental Health Institute in Oshkosh on an emergency detention order. *Id.* ¶ 422. The Outagamie Crisis Center contacted the Outagamie Sheriff's Department, requesting that it provide two officers to transport Yang from St. Elizabeth's Hospital to the Winnebago Mental Health Institute. *Id.* ¶ 424.

Defendants James Stordock and Thomas Van Horn, who were employed as deputies by the Outagamie Sheriff's Department, were assigned to transport Yang in a minivan from St. Elizabeth's Hospital to the Winnebago Mental Health Institute. *Id.* ¶¶ 307–10, 426. They were

3

made aware that Yang had been diagnosed as suffering from acute mental illness, that she was a likely danger to herself and others, and that she was likely to have impaired judgment and poor impulse control. *Id.* ¶¶ 428–29.

Upon arrival at St. Elizabeth's Hospital, Stordock and Van Horn took custody of Yang and handcuffed her. *Id.* ¶ 432. The Grand Chute police officers who had been supervising Yang in the emergency room briefed Stordock and Van Horn on her condition, warning them that Yang could seem perfectly calm at one moment, but would change and act irrationally in an instant, and that she was very unstable and unpredictable. *Id.* ¶ 432.

The transportation minivan contained a partition that separated the front seats from the back seats. *Id.* ¶ 427. Yang, still in handcuffs, was placed in the back seat of the minivan. Neither deputy sat with her in the back seat to monitor her more closely during transportation. *Id.* ¶ 435. Nor did they engage the child safety locks on the rear doors of the minivan. *Id.* ¶ 436. While the deputies transported Yang, Stordock noticed that she was behaving strangely. *Id.* ¶ 440. She then opened the back door, jumped or fell out of the moving minivan, struck the pavement, and died moments later. *Id.* ¶ 441. Plaintiffs allege that the van did not carry any emergency first aid equipment, *id.* ¶ 446, though it is unclear whether the availability of such equipment would have made any difference.

## ANALYSIS

### A. Due Process Claim

Plaintiffs allege that Strodock and Van Horn violated Yang's Fourteenth Amendment right to substantive due process by failing to take reasonable steps to secure her safety and not carrying with them safety supplies in case of an emergency. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property,

4

without due process of law." It is well-established that "the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)). "As a general matter, a government officer's failure to protect an individual against private violence, including self-inflicted violence, simply does not constitute a violation of the Due Process Clause." *Id.* at 197. There are exceptions to this general rule, however. It is by now also well-established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for the person's safety and general well-being." *Id.* at 199–200.

Unlike care and treatment of a person serving a sentence for a crime, which is assessed under the "cruel and unusual punishment" clause of the Eighth Amendment, *Estelle v. Gamble*, 429 U.S. 97 (1976), the care provided to those held in custody for reasons other than conviction for a crime, whether their custody is due to pending criminal charges or severe mental illness, is assessed under the Due Process Clause of the Fourteenth Amendment. *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (applying the due process standard to a suicide case of a detainee that was being transported to a mental health institute). More recent caselaw makes clear that the standards are not the same.

The controlling inquiry for assessing a due process challenge to the care, or lack thereof, provided to a person held in custody for reasons other than conviction for a crime proceeds in two steps. *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (citing *Miranda v. Cnty. of Lake*, 900 F.3d 335 (7th Cir. 2018)). The first step focuses on "the intentionality of the individual defendant's conduct." *Id.* It "'asks whether the . . . defendants acted purposefully,

5

knowingly, or perhaps even recklessly when they considered the consequences of their handling of plaintiff's case.'" *Id.* (quoting *Miranda*, 900 F.3d at 353) (brackets omitted). "A showing of negligence or even gross negligence will not suffice." *Id.*

At the second step, the question is "whether the challenged conduct was objectively reasonable." *Id.* (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015); *Miranda*, 900 F.3d at 354). This standard requires the court "to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate . . . care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.*

Applying this standard to the facts alleged in the Amended Complaint, the court concludes that Plaintiffs have stated a due process claim under the Fourteenth Amendment against Deputies Stordock and Van Horn. Plaintiffs allege that "Deputies Stordock and Van Horn ignored the need to engage the safety locks – which, if engaged, would have prevented the doors from being opened from the inside – on the vehicle's back doors, in spite of the fact that Ms. Yang had a very recent history of trying to escape from police and in spite of the fact that they had been thoroughly briefed by the Grand Chute police officers at St. Elizabeth's hospital on Ms. Yang's condition, including her conduct at St. Elizabeth's in going from calm to very agitated in a moment." Am. Compl. ¶ 436. They further allege that "[t]he process of engaging the safety lock on the back doors of the transport vehicle is a simple mechanical operation, which could have been easily accomplished by either deputy." *Id.* ¶ 437.

These allegations are sufficient, at least at the pleading stage, to meet both steps of the two-step assessment of a due process claim based on a failure to care for a person held in custody by governmental actors. The deputies are alleged to have been made aware of the fact that Yang was

6

psychotic. This, together with the allegation that the deputies "ignored" the need to activate such a simple mechanism that would have prevented the tragedy that occurred is sufficient to satisfy both elements. "In reviewing the complaint on a motion to dismiss, 'no more [is required] from plaintiff['s] allegations of intent than what would satisfy Rule 8's notice pleading minimum and Rule 9(b)'s requirement that motive and intent be pleaded generally.'" *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (quoting *Triad Assoc., Inc. v. Robinson*, 10 F.3d 492, 497 (7th Cir. 1993)). The allegation that the deputies "ignored" the need to activate the safety locks is sufficient to meet the intent element. It suggests more than mere negligence or even gross negligence. And the allegation that by taking the simple step of activating the locks the deputies would have prevented the tragedy is sufficient to meet the "objectively unreasonable" element. Defendants' motion to dismiss Plaintiffs' due process claim is therefore denied.

### B. Qualified Immunity

Alternatively, Defendants argue that Plaintiffs' § 1983 claim should be dismissed because the deputies are entitled to qualified immunity. Under this doctrine, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (*per curiam*)). The doctrine strikes a balance between the public interest in safeguarding constitutional guarantees on the one hand and, on the other, the concern that subjecting government officials to personal liability and harassing litigation would inhibit them in discharging their duties. *Id.*

The right of individuals held in government custody to protection from threats of harm over which, because of their custodial status, they cannot protect themselves is well-established. *See, e.g.*, *Estelle*, 429 U.S. at 104–05; *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994). That this right exists even when the threatened harm is due to the detainee's suicidal tendencies or major mental illness is also clearly established. *See Rosario*, 670 F.3d at 820–22; *Miranda*, 900 F.3d at 353–54; *McCann*, 909 F.3d at 886; *see also Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) (noting that while courts may not define clearly established law at too high a level of generality, it is clearly established that detainee's right to be free from deliberate indifference to risk of suicide is violated if defendant has actual knowledge of serious risk of suicide and chooses "to do nothing"). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*) (internal quotation marks omitted).

Defendants argue that, although the general principle that governmental actors must take reasonable steps to protect individuals held in custody may be clearly established, "there is no clearly established law holding officers constitutionally liable [for] failing to take additional measures when transporting an individual who is being committed under Chapter 51." Defs.' Br. in Supp. at 19, Dkt. No. 14. Defendants cite several cases in which the failure to take such measures was found to constitute at most negligence. *Rosario*, 670 F.3d at 822 (detainee fatally cut himself with razor blade hidden in wallet while riding in backseat of squad); *Deray v. City of Colorado Springs*, No. 11-CV-02639, 2013 WL 1149550 (D. Col. Mar. 19, 2013) (detainee died after he jumped from moving squad and ran into oncoming traffic); *Gish v. Thomas*, No. 3:05-CV-00129-JTC, 2007 WL 9735728 (N.D. Ga. Mar. 8, 2007) (detainee exited back of squad, grabbed firearm left on front seat, and fatally shot himself); *Barron v. Dallas Cnty.*, No. 3:03-CV-0153-P,

8

2004 WL 690836 (N.D. Tex. Mar. 30, 2004) (juvenile killed when she unbuckled seatbelt and jumped from transport van). Based on the holdings in these cases, Defendants argue that the clearly established law is not that law enforcement officers violate the Due Process Clause by failing to take additional steps to protect mentally ill detainees in their custody, but that failing to do so is not a violation.

But each of these cases was decided on summary judgment, not a Rule 12(b)(6) motion to dismiss. It is only after reviewing a more complete record that those courts decided that the defendant officers did not have the requisite state of mind for a constitutional violation, that they acted with at most gross negligence. In this case, as noted above, Plaintiffs have alleged that the deputies "ignored the need to engage the safety locks." Am. Compl. ¶ 436. This suggests that the deputies acted "purposely, intentionally, or perhaps even recklessly when they considered the consequences of their handling of plaintiff's case." *McCann*, 909 F.3d at 886. Plaintiffs concede that discovery may reveal that the failure to activate the locks may turn out to be simple negligence. They contend, however, that the record as it now stands does not permit such a determination.

The court agrees. Factual issues regarding the deputies' intentionality must be resolved before the court is able to determine whether there was even a constitutional violation. The same factual issues preclude a determination of whether the deputies are immune. Those factual disputes concern whether Deputies Stordock and Van Horn knew that Yang was suicidal and whether their failure to activate the locks was purposeful, intentional or at least reckless. *Id.*; *Estate of Clark*, 865 F.3d at 551.

As for the question of qualified immunity, the mere fact that no case has specifically held that the failure of law enforcement officers to activate door locks amounts to a constitutional violation does not mean that the duty to do so under these circumstances was not clearly

9

established. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (internal quotation marks and brackets omitted). As the Court stated in *Hope*, "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* The key question is whether the state of the law at the time in question gave the defendants fair warning that their failure to take steps to prevent Yang from harming herself was unconstitutional. *Id. Rosario*, *Miranda*, *McCann*, as well as *Estate of Clark*, all indicate that the law was clear. For this reason, Defendants' motion to dismiss Plaintiffs' due process claim against Deputies Stordock and Van Horn on the ground of qualified immunity will be denied.

### C. *Monell* Claim

Plaintiffs allege that the County is also liable under § 1983 for the due process violation allegedly suffered by Yang. "Municipalities cannot be held vicariously liable under § 1983 for the constitutional torts of their employees; for the City to be liable, a municipal policy or custom must have caused [plaintiffs'] constitutional injury." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 672 (7th Cir. 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). The Seventh Circuit has "recognized three types of municipal action that can support municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking

10

authority." *Id.* at 675 (internal quotation marks and citation omitted). The Seventh Circuit has held that "[i]naction can also give rise to liability if it reflects the municipality's 'conscious decision not to take action.'" *Id.* (quoting *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017)).

Plaintiffs allege that Outagamie County violated Yang's due process rights by failing to adopt a policy of requiring officers providing transport of mentally ill detainees to activate the locking mechanism of all transport vehicles and its failure to equip all transport vehicles with basic safety and emergency supplies. Am. Compl. ¶ 504. Plaintiff further alleges that the County violated Yang's rights by failing to train its deputies on how to provide safe and secure transport of mentally ill detainees and adequately supervise them. *Id.* ¶ 505. In other words, Plaintiffs do not allege that the County directly violated Yang's rights. Plaintiffs' claim is that the violation of Yang's due process right was caused by a "gap" in the County's policies.

As the court explained in *Bohanon*, a gap claim presents "difficult problems of proof." 46 F.4th at 676 (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021)). "A gap in policy 'amounts to municipal action for *Monell* purposes only if the [municipality] has notice that its program will cause constitutional violations.'" *Id.* (quoting *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379 (7th Cir. 2020) (*en banc*)). "Typically notice is established by 'a prior pattern of similar constitutional violations.'" *Id.* at 676–77 (quoting *J.K.J.*, 960 F.3d at 380). But a previous pattern of violations is not needed in every case. In some circumstances, "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights' that a factfinder could find deliberate indifference to the need for training." *J.K.J.*, 960 F.3d at 380 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "In that event, the failure to provide proper training may fairly be said to represent a policy for which the

city is responsible, and for which the city may be held liable if it actually causes injury." *Harris*, 489 U.S. at 390. "Put another way, a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380.

The pleading stage is not the appropriate time to determine whether Plaintiffs can meet this exacting level of proof. Plaintiffs have alleged that Yang's death could easily have been prevented by simply activating the locks on the passenger section of the transport van and that the need to do so should have been apparent, given Yang's mental condition. Plaintiffs further allege that the two deputies assigned to transport Yang to the mental health institution where she was to be treated failed to do so and had received no training on how to safely and securely transport detainees suffering from severe mental illness. This is sufficient, at least at this stage, to state a *Monell* claim under § 1983. Defendants' motion to dismiss the *Monell* claim against Outagamie County will therefore be denied.

### D. ADA and Rehabilitation Act Claims

Plaintiffs also assert discrimination claims under Title II of the ADA and the Rehabilitation Act. Am. Compl. ¶¶ 501–02. Both types of claims are "functionally identical" and "[t]he analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal quotation marks and citations omitted). Each of the two claims "requires the plaintiff to allege that (1) he is a qualified person (2) with a disability and (3) the [state agency] denied him access to a program or activity because of his disability." *Id.* (internal quotation marks and citations omitted).

More specifically, the "public services" subchapter of the ADA, provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  *Id.* § 12112(b)(5)(A).  To prevail on such a claim, a qualified person with a disability must ultimately prove that "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people."  *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (*en banc*) (citation omitted).

In this case, both claims rely on the allegation that Outagamie County discriminated against Yang when it "failed to create a policy that would provide for a tailored response by deputies providing transport for her that would accommodate her mental health disability and maintain her safety."  Am. Compl. ¶¶ 501–02.  Deliberate indifference has been adopted as the proper standard for obtaining compensatory damages under Title II of the ADA and the Rehabilitation Act.  *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 862 (7th Cir. 2018).  To establish deliberate indifference, a plaintiff must show "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood."  *Id.* at 863 (internal quotation marks omitted).

From what has already been said concerning Plaintiffs' *Monell* claim against the County, it follows that Plaintiffs' ADA and Rehabilitation Act claims survive at this stage.  Transportation of individuals alleged to have severe mental illnesses to mental health treatment centers pursuant to Chapter 51 would seem to constitute a public service.  The alleged failure to enact any policy or provide any training to deputies assigned to transport seriously mentally ill detainees to mental

health facilities would disproportionately affect individuals suffering from mental disabilities. And if the consequences of failing to provide such safety precautions and training is as tragic as this case suggests, it is at least arguable that the need to do so should have been obvious.

Defendants argue that the Amended Complaint fails to allege that Yang was a qualified individual with a disability. Although the Amended Complaint alleges that Yang experienced an episode of psychosis and attempted to harm herself on May 29 and May 30 of 2022, Defendants argue there are no allegations regarding the nature, severity, duration, expected duration, permanent or long-term impact, or expected impact of the same. Because Plaintiffs failed to allege that Yang was an individual with a disability, Defendants argue that the ADA and Rehabilitation Act claims must be dismissed.

The term "disability" with respect to an individual, is defined in the ADA as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1). "Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A).

Given the chronic nature of most mental illnesses, the severe symptoms described in the Amended Complaint are sufficient to support the reasonable inference that Yang suffered from a mental impairment that severely limited one or more major life activities. That is sufficient at this stage of the proceedings. Accordingly, Defendants' motion to dismiss is denied as to these claims as well.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss the amended complaint (Dkt. No. 13) is **DENIED**. The Clerk is directed to set this matter on the court's calendar for a Rule 16 scheduling conference.

**SO ORDERED** at Green Bay, Wisconsin this 8th day of March, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge