UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NAVTEJ BHANDARI and
ESTATE OF XEE YANG,

          Plaintiffs,

      v.                             Case No. 23-C-986

OUTAGAMIE COUNTY,
JAMES STORDOCK, and
THOMAS VAN HORN,

          Defendants.

---

**DECISION AND ORDER DENYING-IN-PART AND GRANTING-IN-PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Xee Yang suffered fatal injuries when she fell or jumped from a moving minivan onto the highway as she was being transported to the Winnebago Mental Health Institute by two Outagamie County Sheriff Deputies, James Stordock and Thomas Van Horn. Her husband and her estate (collectively, the Estate) brought this action seeking money damages against the two deputies (collectively, the Deputies), who were transporting her, and Outagamie County. The amended complaint asserts six separate claims: (1) a Fourteenth Amendment due process claim against the Deputies under 42 U.S.C. § 1983; (2) a similar claim against the County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); (3) a claim against the County under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(A); (4) a claim against Outagamie County under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; (5) a state law wrongful death claim against the Deputies under Wis. Stat. § 345.05(2); and (6) a state law claim against the County for indemnification of the Deputies for their personal liability under Wis. Stat. § 845.46.

The court has jurisdiction over the Estate's federal law claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over its state law claims pursuant to 28 U.S.C. § 1367. Presently before the court is Defendants' motion for summary judgment dismissing the Estate's federal claims with prejudice and its state law claims without prejudice. For the following reasons, Defendants' motion will be denied as to the Estate's Fourteenth Amendment claim against the Deputies but granted as to the remaining federal claims. Because the federal claim against the Deputies survives, the motion to dismiss the state law claims without prejudice will be denied.

## BACKGROUND

At approximately midnight on May 30, 2022, Grand Chute Police Officers were dispatched to the home of Xee Yang and Navtej Bhandari for a welfare check. Ms. Yang's sister had called 911 saying that Ms. Yang was experiencing a psychotic episode, was acting violently toward her family, and had tried to cut her own neck with a fork. Bhandari met with the officers outside of the house and informed them that police had been called to the home earlier the previous day when Ms. Yang was behaving erratically and speaking incoherently. She fled from police at that time and tried to break into a neighbor's home. Bhandari said that since the police left, Ms. Yang's mental health issues seemed to have gotten worse. Bhandari stated that he had placed all the knives and sharp instruments out of her reach after Ms. Yang had tried to cut her throat with a fork.

Upon entering the home, Grand Chute Police Officer Ben Watson saw Ms. Yang sitting on a couch surrounded by members of her family. She appeared drenched in sweat, was breathing heavily, and was staring around the room aimlessly. She claimed nothing was wrong but appeared unable to focus, went into a trance, and began speaking Hmong gibberish. As she rocked back and forth, her family stated she was saying, "Kill them all."

2

After a call had been placed to the Outagamie Crisis Center to request a mental health assessment, Ms. Yang attempted to leave. At that point, Officer Watson took her into custody and placed her in handcuffs. The officers then called for an ambulance to transport her to St. Elizabeth Hospital where a medical and mental health assessment would be conducted. Officer Watson rode with Ms. Yang in the back of the ambulance to the hospital. Upon arrival at the hospital, he handcuffed Ms. Yang to the bed in which she was placed as the medical staff examined her. Officer Watson maintained watch over Ms. Yang, as did the Grand Chute officers who took over after his shift was completed, throughout the early morning and daytime hours. Ms. Yang appeared at times calm and at other times mentally unstable. She continued to behave erratically, at one point swallowing a religious necklace.

Under Wisconsin law, a person may be involuntarily detained on an emergency basis at a mental health treatment facility for up to 72 hours without a court order if the person (1) is reasonably believed to be mentally ill; (2) demonstrates a substantial probability of physical impairment or injury to himself or herself or other individuals due to impaired judgment, as manifested by evidence of a recent act or omission; and (3) is reasonably believed to be unwilling to cooperate with voluntary treatment. Wis. Stat. § 51.15(1). Upon assessment, Ms. Yang was found to meet these criteria, and a Statement of Emergency Detention was completed and signed by Officer Watson and Anne Hoffman, the on-call Community Support Specialist for the Mental Health Division of the Outagamie County Department of Health and Human Services. A placement for Ms. Yang at Winnebago Mental Health Institute was arranged, and the Outagamie Sheriff's Department was contacted to provide transportation. Because of Ms. Yang's erratic behavior, the hospital personnel requested a two-person transport.

3

Deputies James Stordock and Thomas Van Horn were assigned to provide the transport shortly after 5:00 p.m. on May 30, 2022. The Deputies were advised that the transferee-patient was committed under Chapter 51 and that she was "up and down," which Deputy Stordock took to suggest the patient could be cooperative or uncooperative. Deputy Stordock elected to use an unmarked Dodge Caravan minivan rather than a squad car as the transport vehicle. After rendezvousing at the Outagamie County Government Center, the Deputies departed in the transport van for St. Elizabeth Hospital.

The transport van was equipped with a plexiglass partition that separated the front row of seats from the rest of the car. A mirror above the front windshield allowed the driver to observe the transferee above the shoulders, assuming the driver's vision was not focused on the road. The minivan's rear sliding doors had a child-safety lock mechanism that, when engaged, prevented the door from being unlocked and opened from the inside. In addition to the child-safety lock, the minivan's doors automatically locked once the vehicle reached between 10 and 15 miles per hour, but a passenger could override the automatic lock by manually unlocking the door from inside the vehicle.

Upon arrival to the hospital, Deputy Stordock parked the transport van immediately in front of the hospital entrance. The Deputies then proceeded to Ms. Yang's hospital room where they met with hospital staff and two officers from the Town of Grand Chute Police Department who had been monitoring Ms. Yang. The Grand Chute officers gave the Deputies a "rundown" of Ms. Yang's prior behavior, specifically recounting the incident in the hospital where Ms. Yang had swallowed a religious necklace. The record also indicates that the Grand Chute officers advised the Deputies that Ms. Yang had a propensity to be "completely calm" one minute and "completely switch and start acting very irrationally" the next. Frederickson Dep. at 10, Dkt. No. 42. At some

4

point, the Deputies were provided with an envelope containing the Chapter 51 paperwork necessary for Winnebago Mental Health Institute to accept Ms. Yang as a patient. It was from this paperwork that Deputy Van Horn first learned that the transferee-patient was named Xee Yang, though he asserts he did not read any of the other information contained in the Chapter 51 paperwork.

The Deputies then introduced themselves to Ms. Yang, who was handcuffed to the bedrails. Deputy Stordock observed redness around Ms. Yang's wrists, which he concluded was the result of Ms. Yang struggling against the handcuffs. The Grand Chute officers recommended that Ms. Yang remain handcuffed during transport because of her erratic behavior. The Deputies decided to restrain Ms. Yang using a belly belt—a restraint that wraps around an individual's waist and connects to handcuffs by way of a D-ring situated near the navel, thus allowing the individual's hands to be in front of their body while still limiting hand and arm mobility. During the process, Ms. Yang complained of being cold, so Deputy Van Horn retrieved a heated blanket and wrapped it around her. After Ms. Yang was restrained, the Deputies assisted her into a wheelchair, covered her with the blanket, and wheeled her to the transport van where they assisted her into the passenger-side back seat. The Deputies closed the rear sliding door of the van and seated themselves in front—Deputy Stordock behind the wheel and Deputy Van Horn in the passenger-side front seat. They then departed for Winnebago Mental Health Institution.

Soon after departing the hospital, Deputy Stordock heard the doors "click," indicating the automatic door locks had engaged. Sometime thereafter, he observed in the mirror that Ms. Yang was fidgeting and asked Deputy Van Horn to check on her. Deputy Van Horn turned around and noticed Ms. Yang's blanket had fallen off her lap and was now on the floorboard; he asked if she was all right. She, seemingly attempting to reach for the blanket, responded that she was cold and

requested that the Deputies turn the air conditioning down. It was around this time that, while traveling on U.S. Route 10, which has a speed limit of 65-miles-per-hour, Deputy Stordock sensed a change in pressure in the vehicle. He turned around and observed Ms. Yang unbuckled, partially on her feet, and near the door which was slightly ajar. Ms. Yang then jumped or fell out of the vehicle, rolled across the pavement, and came to rest in the adjacent lane. Deputy Stordock stopped the van, Deputy Van Horn radioed for Emergency Medical Services (EMS), and the two attempted to provide lifesaving care until EMS staff arrived. Ms. Yang died moments later from her injuries.

The Estate brought this suit seeking compensatory and punitive damages. The Estate claims that the Deputies violated Ms. Yang's right, secured by the Fourteenth Amendment to the United States Constitution, by failing to provide safe and secure transport for her in her acutely psychotic condition. The Estate also claims that the County violated Ms. Yang's Fourteenth Amendment right by failing to adopt policies and/or provide training and supervision for its Sheriff deputies to ensure the safe and secure transport of mentally ill persons. The County's failure to adopt a policy for the safe transportation of mentally ill persons also violated Ms. Yang's rights, the Estate asserts, under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(A) *et seq*., and the Rehabilitation Act, 29 U.S.C. § 701 *et seq*. Finally, the Estate claims that the Deputies are liable in damages under state law for negligently causing Ms. Yang's death and that the County is required to indemnify them for such liability under Wis. Stat. § 895.46.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material facts" are those under the

6

applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*; *Navratil v. City of Racine*, 101 F.4th 511, 519 (7th Cir. 2024). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Navratil*, 101 F.4th at 518. "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts;" instead, it must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322).

## ANALYSIS

### A.     Fourteenth Amendment Due Process Claim against the Deputies

#### 1.   Factual Disputes Preclude Summary Judgment on the Merits

The Estate claims that the Deputies violated Ms. Yang's Fourteenth Amendment right to due process by failing to take objectively reasonable steps to prevent her from fatally harming herself. As a general rule, a government officer's failure to protect an individual against private violence, including self-inflicted violence, does not constitute a violation of the due process clause. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). The rule is otherwise, however, when a government officer takes a person into custody. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon

7

it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200. This is because by "restrain[ing] an individual's liberty," the State "renders him unable to care for himself" or "act on his own behalf." *Id.* at 200 (citing other sources). Thus, a civil detainee, like a pretrial criminal detainee, may assert a viable failure-to-protect claim under the Fourteenth Amendment when the government fails to protect the civil detainee from harm, including self-inflicted harm where the detainee is deemed incompetent. *Miranda v. County of Lake*, 900 F.3d 335, 349 (7th Cir. 2018). A key question in such cases is what is the state of mind a government official must be shown to have in order for a plaintiff to prevail on a Fourteenth Amendment failure-to-protect claim?

In *Kingsley v. Hendrickson*, the Court addressed the state of mind required for a pretrial detainee's excessive force claim against a jail officer under the Fourteenth Amendment. 576 U.S. 389 (2015). The Court analyzed the claim using a two-part test that addresses what the Court described as the "two separate state-of-mind questions" that arise in such cases. *Id.* at 395. "The first concerns the defendant's actions with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world." *Id.* "The second question," the Court explained, "concerns the defendant's state of mind with respect to whether his use of force was 'excessive.'" *Id.* Because "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process," *id.* at 396 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)), the Court concluded that as to the actions taken by him, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind," *id.* As to the second part—whether the force used by the officer was excessive—the Court held that the test was objective reasonableness. *Id.* at 396–97. In other words, the officer's subjective state of mind as to whether he intended to punish the detainee is irrelevant. A detainee's due

8

process rights are violated if the force intentionally or purposefully used by the officer is objectively unreasonable.

In *Miranda v. County of Lake*, the Seventh Circuit joined several other circuits in extending *Kingsley*'s two-step framework and objective reasonableness standard from excessive force claims to failure-to-protect claims arising under the Fourteenth Amendment. 900 F.3d at 351–52. *Miranda* involved a mentally ill pretrial detainee who died of "complications of dehydration and starvation" after refusing food and drink while confined in the jail over a period of approximately two weeks. *Id.* at 342 (capitalization omitted). The decedent's estate sued the county that owned and operated the jail, as well as the jail officials and health care workers who were responsible for the decedent's care for violating her constitutional rights under 42 U.S.C. § 1983 and on assorted state law grounds. *Id.* The district court dismissed the claims against the county and the jail officials on summary judgment, and the case proceeded to trial on the claims against the medical defendants. *Id.* at 342–43. Although the jury returned a verdict against one of the defendants for a portion of the decedent's pain and suffering, the estate appealed the district court's dismissal of its claim for additional damages arising from the decedent's death against the other medical defendants. *Id.* at 343. The court of appeals partially reversed the district court's judgment, concluding that the court had erred in dismissing a portion of the estate's claim against the other medical defendants who had failed to have the decedent transferred from the jail to the hospital until it was too late. *Id.* at 354. The court also held that the district court had erred in its instructions to the jury on the issue of intent required on the due process claim. *Id.* at 350–54. It was in this part of its decision that the court extended *Kingsley*'s two-step analysis to failure-to-protect claims.

In applying *Kingsley*'s test for excessive force to the failure-to-protect claim in *Miranda*, the court rejected the argument that adopting an objective-reasonableness standard in failure-to-

protect cases would constitutionalize medical malpractice or negligence claims. The court instead held that requiring the detainee to prove "more than negligence" at the first step of the *Kingsley* analysis would maintain the distinction between common law negligence claims and constitutional violations. *Id.* at 353. In the case before it, for example, the court noted that there was evidence that the medical defendants "deliberately chose a 'wait and see' monitoring plan, knowing that [the decedent] was neither eating nor drinking nor competent to care for herself." *Id.* at 354. From this evidence, the court explained, "[a] properly instructed jury could find that [the medical defendants] made the decision to continue observing [the decedent] in the jail, rather than transporting her to the hospital, with purposeful, knowing, or reckless disregard of the consequences." *Id.* The court also acknowledged, however, that "[i]t would be a different matter if, for example, the medical defendants had forgotten that [the decedent] was in the jail, or mixed up her chart with that of another detainee, or if [one of the medical defendants] forgot to take over coverage for [the other] when he went on vacation." *Id.* "Such negligence," the court held, "would be insufficient to support liability under the Fourteenth Amendment." *Id.* In any event, because the evidence was sufficient to permit a jury to find both that the medical defendants had acted or failed to act "with purposeful, knowing, or reckless disregard of the consequences," and that their deliberate failure to act was "objectively unreasonable," the estate was entitled to a new trial on its claim against the medical defendants. *Id.*

More recently, in *Pittman v. Madison County* (*Pittman IV*), the Seventh Circuit narrowed *Miranda*'s statement of the first state-of-mind inquiry—what *Kingsley* had called "the defendant's state of mind with respect to his physical acts." 108 F.4th 561, 569 (7th Cir. 2024) (quoting *Kingsley*, 576 U.S. at 395). *Miranda* had held that the first inquiry was "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the

10

consequences of their [actions]." 900 F.3d at 353. *Pittman IV* noted that this phrasing of the test suggested that the defendant in a failure to act case must be aware of the consequences of his failure to act in order to meet the first step in the analysis: "Under this interpretation, a defendant must subjectively know the consequences of their action or inaction to act purposefully, knowingly, or recklessly." 108 F.4th at 569. But quoting from *Kemp v. Fulton County*, 27 F.4th 491, 497 (7th Cir. 2022), *Pittman IV* explained, "our failure-to-protect cases perceive the first inquiry as a lower bar, requiring proof only that a defendant 'intended to carry out a certain course of actions.'" 108 F.4th at 569. "[O]nce a defendant deliberately acts," *Pittman IV* held, "their awareness of the risk of harm, or lack thereof, goes only to objective reasonableness." *Id.* *Pittman IV* thus eliminated any consideration of the defendant's recklessness as to the potential consequences of the failure to act in the first step of the analysis.

Applying this analysis to the facts of this case, the two-fold inquiry is: (1) Was the Deputies' failure to take additional steps to protect Ms. Yang from harm, including self-harm, during the transport knowing and purposeful, as opposed to merely negligent? and (2) Was their failure to take additional steps to safeguard Ms. Yang objectively unreasonable? If the evidence is insufficient to legally support a jury finding of "yes" as to either question, the Estate's Fourteenth Amendment due process claim fails.

The Estate alleges that the Deputies violated Ms. Yang's Fourteenth Amendment right by failing to engage the van's child-safety-lock mechanism, failing to have one deputy ride in the back of the van with Ms. Yang, and failing to properly handcuff her with her hands in back. Had any of these steps been taken, the Estate contends, Ms. Yang would not have been able to open the door of the moving van and either fall or jump to her death. Defendants argue that, even if these allegations are true, the Deputies are nevertheless entitled to summary judgment on the Estate's

11

claim against them because the undisputed evidence establishes that their failure to take the additional precautions was at most negligence and thus does not amount to a violation of Ms. Yang's constitutional rights.

It is, of course, well established that negligence, by itself, does not render a state official liable for resulting harm under the Fourteenth Amendment. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."). In support of their argument that the Deputies' failure to take the steps the Estate claims should have been taken was at most simple negligence, Defendants point to the testimony of the Deputies that "they were not aware the transport van was equipped with child safety locks and believed that '[i]n this particular vehicle, when you put the vehicle in drive and you reach 10 or 15 miles an hour, the doors automatically lock [and] once that vehicle is in motion, those doors cannot open' from the inside." Defs.' Br. in Supp. at 5, Dkt. No. 32 (quoting Defs.' Proposed Findings of Fact (PFOF) ¶¶ 43–45, Dkt. No. 33). Defendants also note that from the time the Deputies arrived at the hospital to the time they departed, Ms. Yang seemed calm and cooperative, never attempted to escape or fight with them, and never expressed any intent to harm herself. *Id.* Because they had not read the Statement of Emergency Detention (out of concern for her privacy), the Deputies state they were unaware of her previous suicidal or self-harming behavior. In further support of their argument, Defendants also point to the numerous steps the Deputies took to keep Ms. Yang comfortable and to avoid upsetting her, including using an unmarked van and not activating emergency lights, wearing civilian clothes, taking the fastest route, providing her a heated blanket, handcuffing her with her hands in front, adjusting the temperature when she complained of being cold, etc. *Id.* at 19.

The relevant question, however, is not whether the Deputies were kind to Ms. Yang and tried to keep her comfortable; the question is whether they intentionally and purposefully failed to take the steps needed to keep her safe. If it is true, as Defendants contend, that the Deputies did not know that the back doors of the van could be opened from the inside once the van was in motion or that Ms. Yang was suicidal, then it would seem to follow that their failure to take the precautions the Estate argues should have been taken may be at most negligent, and not knowing or purposeful as the first step in the analysis requires. This follows from the court's suggestion in *Miranda* that it would be at most negligence "if, for example, the medical defendants had forgotten that [the decedent] was in the jail, or mixed up her chart with that of another detainee, or if [one of the medical defendants] forgot to take over coverage for [the other] when he went on vacation." 900 F.3d at 354. In other words, ignorance of crucial information apparently precludes a finding that the defendant's action or failure to act was knowing and purposeful.

But as the Estate points out, there is also evidence from which a jury could conclude that the Deputies did know how the locks on the van worked and that Ms. Yang was a danger to herself. As a general matter, one would assume that experienced law enforcement officers would be familiar with the need to prevent persons taken into custody for criminal conduct from escaping from the back of the vehicles used to transport them from the scene of a crime or the location of their arrest. More specifically, there is evidence that the Deputies were told during their training that all law enforcement vehicles were equipped with child-safety locks and received training on how to activate them. Pls.' PFOF ¶¶ 82, 83, 92. Given this general knowledge and the specific evidence of the training they received, a jury would not be required to accept the Deputies' testimony that they did not know how the locking mechanisms on the transport van worked. The issue is one of credibility, and credibility is for the factfinder to determine. *See Reinebold v. Bruce*,

18 F.4th 922, 927 (7th Cir. 2021) ("A district court judge 'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts' when ruling on a motion for summary judgment." (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003))).

The same is true concerning the Deputies' claim that they were unaware that Ms. Yang was suicidal. As trained Wisconsin law enforcement officers, the Deputies would know as part of their training and experience that anyone who is subject to an involuntary emergency commitment under Chapter 51 of the Wisconsin Statutes is suffering from a serious mental illness, has been determined to be dangerous to themselves or others, and is unwilling to cooperate with treatment voluntarily. They would know that a person with a severe mental illness often acts irrationally and thus must be prevented from harming themselves or others, even without reviewing the Statement of Emergency Detention that accompanied the person being detained. Defs.' Resp. to Pls.' PFOF ¶ 27, Dkt. No. 55. In addition, there is evidence that the Deputies were specifically told that Ms. Yang was acting irrationally and needed to be watched closely. The Deputies knew that a two-person transport was requested, which itself was an indication that the person being transported was not cooperating. Upon their arrival at the hospital, they saw that she had been handcuffed to her bed, and they were told by the Grand Chute officer who had been maintaining watch over her that Ms. Yang would go from seeming calm and cooperative to completely irrational. The Statement of Emergency Detention the Deputies were given described Ms. Yang's condition as "acute psychosis" with the presenting problem of "agitation" and noted that she had "violent behavior toward family," "tried to cut her own throat with a fork," and was "going in and out of trances." *Id.* ¶ 65. Although the Deputies deny they read the Statement of Emergency Detention, this, too, raises a question of credibility. From this evidence, a jury could conclude that the

14

Deputies did not lack crucial knowledge of the relevant facts and that their failure to take precautions to prevent Ms. Yang from harming herself was knowing and purposeful.

A reasonable jury could also conclude that the failure to take some or all of the precautions the Estate argues should have been taken was objectively unreasonable. To see this, one need only consider the contrast in the steps taken by Grand Chute Police Officer Watson and the Deputies to ensure Ms. Yang's safety. Upon taking her into custody, Officer Watson restrained Ms. Yang's hands behind her back so she could not use them to harm herself or others. He called an ambulance and rode with her in the back to the hospital so he could watch over her. And once Officer Watson and Ms. Yang arrived at the hospital, he handcuffed her to the bed and continued to maintain watch over her until he was replaced. This evidence, together with the expert opinions expressed in the report of retired Brown County Sheriff Officer Randall Revling, Dkt. No. 48-1, is sufficient to allow a jury to conclude that the Deputies' failure to take such steps was objectively unreasonable.

Defendants have devoted much of their brief to a discussion of previous cases in which claims against law enforcement officers for failing to prevent detainees from harming themselves were dismissed on summary judgment. Defs.' Br. in Supp. at 11–18. They place substantial weight, for example, on the Seventh Circuit's decision in *Rosario v. Brawn*, 670 F.3d 816 (7th Cir. 2012). In that case, the father of a man who committed suicide while in the custody of Washington County Sheriff deputies brought suit as special administrator of his son's estate alleging that the deputies had violated the son's Fourteenth Amendment right by failing to protect him from himself. *Rosario*, 670 F.3d at 818. The deputies had taken the son into custody and determined that he should be involuntarily committed pursuant to Wis. Stat. § 51.15. One of the deputies searched the man's wallet but failed to discover a razor blade concealed inside the wallet before returning it to him. As he was being transported to the mental health facility in the back of the

squad car, the detainee retrieved the razor from his wallet and used it to commit suicide. *Id.* at 817–18. The district court granted the deputies' motion for summary judgment, concluding that the deputies' failure to prevent the tragic death was at most negligent and thus could not amount to a constitutional violation. *Id.* at 820. The Seventh Circuit affirmed. *Id.* at 823. Given the similarity between the facts of this case and those of *Rosario*, Defendants argue that the result here should be the same.

But *Rosario*, like the district court decisions Defendants cite from other circuits, was decided under the deliberate indifference standard that governs cases brought under the cruel and unusual punishment clause of the Eighth Amendment. Under the deliberate indifference standard, the plaintiff is required to prove the defendants "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." 670 F.3d at 821 (quoting *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010)). As noted above, in *Miranda*, the court held that standard did not apply in Fourteenth Amendment failure-to-protect cases. Instead, it is the *Kingsley* standard that applies, and instead of deliberate indifference, the standard is objective reasonableness. Given this change in the law, *Rosario* is neither controlling nor persuasive. The same is true of the other failure-to-protect cases upon which Defendants rely.

*Rosario* is also distinguishable on its facts. The deputies in that case failed to find the concealed razor blade when they searched the detainee's wallet. 670 F.3d at 822. In other words, they were negligent in conducting the search and, as a result, did not act knowingly and purposefully in failing to take steps to ensure his safety as is required in the first of the two-step analysis of *Kingsley*. Thus, even under *Miranda*, the result in *Rosario* would be the same. In this case, by contrast, for the reasons explained above, there is evidence from which a jury could find

16

that the Deputies' failure to take the steps needed to safeguard Ms. Yang during transport were purposeful and knowing.

In sum, the Estate has shown that there is evidence from which a reasonable jury could find that the Deputies acted knowingly and purposefully in failing to protect Ms. Yang from harm and that their failure to do so was objectively unreasonable. This is enough to withstand Defendants' motion for summary judgment on the merits of the Estate's due process claim against the Deputies. There remains, however, the question of whether the Deputies are entitled to qualified immunity.

## 2. Deputies Are Not Immune from Liability

Alternatively, Defendants argue that even if the court concludes there is evidence from which a jury could conclude that the Deputies violated Ms. Yang's Fourteenth Amendment right to due process, they are nevertheless shielded from personal liability under the doctrine of qualified immunity. The doctrine of qualified immunity is "intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (alteration in original) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

Defendants argue that the Deputies are entitled to qualified immunity from any liability for their alleged violation of Ms. Yang's constitutional right because there was no "controlling authority" or "robust consensus of cases of persuasive authority" holding law enforcement officers liable under circumstances similar to those of this case when the incident occurred in May of 2022. Defs.' Br. in Supp. at 20. Defendants note that the Supreme Court has repeatedly emphasized that

"'clearly established law' should not be defined at a high level of generality, that 'existing precedent must have placed the [] constitutional question beyond debate,' and that qualified 'immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 20–21 (alteration in original) (quoting *White*, 580 U.S. at 78–79). Defendants argue that not only is there no precedent holding law enforcement officers liable for failing to prevent detainees from harming themselves while being transported, but in *Rosario* and the four district court cases from other circuits they cited, the claims against law enforcement officers arising out of such circumstances were dismissed on summary judgment. Based on this precedent and in the absence of any cases holding a law enforcement officer liable for detainees jumping or falling out of moving transport vehicles, Defendants argue the Deputies are entitled to qualified immunity.

"A right is clearly established when it is defined clearly enough to put officers on notice of their duties under the circumstances they confront." *Est. of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017). In ascertaining whether a right is clearly established, district courts in this circuit are to look to controlling Supreme Court and Seventh Circuit precedent. *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). It thus follows that the district court cases from other circuits that Defendants cite are not relevant to the issue of qualified immunity in this circuit, except insofar as they may provide notice of the risk of not taking precautions under such circumstances. And for the reasons stated above, *Rosario* cannot be read as immunizing the Deputies from liability here in light of the change in the law in this circuit that *Miranda* brought about and the factual distinction described above.

The constitutional duty of state officials to provide mental patients in their custody such services as are necessary to ensure their "reasonable safety" from themselves and others has long been established. *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) ("If it is cruel and unusual

18

punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions."). *Rosario* itself made clear that this duty was owed not only by those who operate the institutions where persons with mental health and cognitive disabilities are placed, but also law enforcement officers who are tasked with transporting them to such facilities. 670 F.3d at 820–21. And as *Miranda* made clear almost four years before the facts giving rise to this case occurred, the standard by which the knowing and purposeful actions of public officials responsible for the protection and care of detainees would be assessed is objective reasonableness.

It is true that *Miranda* did not involve a detainee jumping or falling out of a moving vehicle while being transported to a mental health facility. But the Court has never said that official action is protected by qualified immunity unless the very action in question has previously been held unlawful; it is enough that the unlawfulness of the officer's act or failure to act is apparent "in the light of pre-existing law." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640). The Court noted in *Hope* that it had expressly rejected a requirement that previous cases be fundamentally similar. "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* at 741.

Defendants' argument is essentially that the Deputies are entitled to qualified immunity because the Estate has failed to cite a case specifically holding that an officer' failure to secure a mentally ill detainee in the back of a transport vehicle renders the officer constitutionally liable for any harm that results. But this argument finds support in neither the law nor logic. The Seventh Circuit rejected a similar argument in *Estate of Perry v. Wenzel*:

> The defendants urge us to narrowly define Perry's right. But, in doing so, they are essentially urging us to conclude that because there is no case with the exact same

19

fact pattern, qualified immunity applies.  That is not what the qualified immunity
analysis requires us to do.

872 F.3d 439, 460 (7th Cir. 2017).  As the court went on to note in *Estate of Perry*, it was clearly

established by 2010 "that an officer or prison nurse's actions were judged by the objectively

reasonable standard of the Fourth Amendment, [and] the failure to take *any* action in light of a

serious medical need would violate that standard."  *Id.*

The argument that law enforcement officers are shielded from liability until and unless the

same factual scenario arises and is litigated through to a final decision by the court of appeals or

Supreme Court also makes no logical sense.  Law enforcement officers are intelligent persons who

are clearly capable of reasoning from the clearly established law that they must protect mentally

ill detainees in their custody from harm to the conclusion that they should take steps in transporting

such a person to ensure they cannot jump or fall out of the transport vehicle while it is traveling

down the highway.  This kind of reasoning is part and parcel of their job.

Defendants emphasize the measures the Deputies took to make sure Ms. Yang was calm

and comfortable.  They note that the Deputies used an unmarked vehicle, wore civilian clothing,

planned and took the shortest route, did not activate emergency lights or a siren, parked in front of

the hospital, learned and addressed Ms. Yang by her name, spoke to her in a calm and polite

manner, and provided a heated blanket when she complained of being cold.  But these and the

other measures Defendants cite did not address her serious medical need—the need to protect her

from her suicidal inclination.

Finally, it should also be noted that this was not a case in which a law enforcement officer

was called upon to make a split-second, life-and-death decision about whether to use deadly force.

*Cf. Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) ("An officer in the line of duty all too

frequently has only that split-second to make the crucial decision.  The events here unfolded in

20

heart-pounding real time, with lives on the line." (citation modified)). The Deputies had plenty of time to fully consider the risk that Ms. Yang, a person under an involuntary emergency mental health commitment, could pose to herself and the readily available precautions that could be taken to protect her from such harm.

As noted above, the Deputies deny that they realized the doors could be opened once they automatically locked and the van was moving. They also deny that they knew Ms. Yang was suicidal. The court has already concluded that these are factual disputes to be resolved by the jury. If the Estate fails to convince the jury that the Deputies did in fact have such knowledge, the Estate's Fourteenth Amendment claim against the Deputies will fail. But for the reasons stated above, if the Estate does prevail on its Fourteenth Amendment claim against the Deputies, qualified immunity does not apply.

**B.** *Monell* **Claim Against the County**

The Estate asserts that the County is also liable for the death of Ms. Yang under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for failing to enact a policy to prevent a known and obvious risk of a constitutional violation and failing to adequately train deputies on the use of child-safety locks and securing rear door handles in transport vans. *Monell* held that while local governments are not strictly liable for the constitutional violations of their employees under the doctrine of *respondeat superior*, they can be held liable for damages under § 1983 for violations of federal rights that occur "pursuant to official municipal policy of some nature." 436 U.S. at 691. Municipal liability under § 1983 is not easily established, however. It requires an act or a failure to act that is "attributable to the municipality [that] itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694). In this respect, the bar is high and to establish

municipal liability under § 1983, a plaintiff must generally show that an "express policy (e.g., policy statement, regulation, or officially adopted decision), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality" was the direct cause of the alleged constitutional deprivation. *J.K.J. v. Polk County.*, 960 F.3d 367, 377 (7th Cir. 2020) (cleaned up). Here, the Estate does not claim that the County had a formal or informal policy that was a direct cause of the alleged constitutional deprivation. Instead, the Estate contends it was the absence of a policy and/or adequate training that caused the violation.

In certain limited circumstances, the absence of a policy and/or training can also give rise to liability under *Monell*. "[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017). As the Court explained in *City of Canton v. Harris*:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

489 U.S. 378, 390 (1989). But where a plaintiff points to inaction or gaps in policy, as opposed to overt municipal action, the road to establishing liability is even more demanding. "[T]he path to *Monell* liability based on inaction is steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *J.K.J.*, 960 F.3d at 378. "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate

22

indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407 (quoting *City of Canton*, 489 U.S. at 388).

The Estate acknowledges that at the time of the incident giving rise to its claims, the Outagamie County Sheriff had a written policy on transporting individuals taken into custody for emergency detention under Chapter 51. That policy reads as follows:

> Such individuals may be transported in the patrol car if the officer believes it can be accomplished safely. This may require additional officers being present in the car. *Sufficient restraints should be used to insure the officer(s)' and individual's safety.*

Policy No. 202.04(B)(5), Dkt. No. 47 at 6 (emphasis added). The policy was recently revised to add the following language at the end: "to include having child safety locks engaged, active if the vehicle is so equipped, or taking other measures to ensure that the doors and windows cannot be accessed or operated by the subject being transported without officer assistance." Dietzen Dep. at 4, Dkt. No. 45.

The Estate argues that the original policy was inadequate because, unlike the revised policy, it did not explicitly instruct officers to have the child safety locks on the vehicle engaged. But policies, by their very nature, are intended to set out general principles that are intended to guide those governed by the policy in carrying out their specific duties. They are not detailed instructions for how every aspect of a job is to be performed under any and all circumstances that can arise. The County's policy statement that when transporting the mentally ill, "[s]ufficient restraints should be used to insure the officer(s)' and individual's safety" is clear enough that a reasonable officer would know to take steps upon transporting a mentally ill individual to a mental health facility for emergency detention to make sure the individual is not able to jump or fall out of a moving vehicle. The fact that the County revised its policy after the incident giving rise to this very case is likely inadmissible, *see* Fed. R. Evid. 407, but in any event it is not evidence that

the original policy was insufficient or that the County was deliberately indifferent to the safety of mentally ill persons. Instead, it demonstrates the County's willingness to revise its policy to provide greater specificity when new situations arise. It is not sufficient to establish municipal liability under *Monell*.

The same is true of the Estate's claim of inadequate training. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389. Thus, the mere fact that an isolated violation occurred is not enough to establish that the County's training is inadequate. As the Court observed in *City of Canton*, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91. It is also possible that "an otherwise sound program has occasionally been negligently administered." *Id.* at 391. Neither occurrence, the Court noted, will be enough "to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.*

In this case it is undisputed that the County required significant training of deputies before they were hired and continued to require ongoing training afterward, including training on handling and transporting mentally ill individuals. The Estate contends that the training was inadequate because the Deputies did not realize how the locks on the transport van worked. But

24

as the Estate noted in its response to Defendants' PFOF, Outagamie County Chief Deputy Jeffrey Dietzen, the County's representative, testified that "all Outagamie County cars, including squad cars, were equipped with child-proof locks for the back doors, and Deputies Stordock and Van Horn had been so trained." Pls.' Resp. to Defs. PFOF ¶ 43, Dkt. No. 52 (citations omitted). It thus appears that the County's training is sufficient even by the Estate's standards even though it failed to prevent the tragedy that occurred here.

It is also undisputed that on no previous occasion did a mentally ill person being transported to a mental health facility by a County officer jump or fall out of a moving transport vehicle. In other words, until this event, the County had no reason to believe that its training might be inadequate. Under these circumstances, its failure to increase or alter its training before the accident occurred cannot be found to reflect the deliberate indifference required to establish municipal liability under *Monell*. The Estate's *Monell* claim must therefore be dismissed.

## C. Americans with Disabilities Act and Rehabilitation Act Claims

The Estate claims that Outagamie County violated Title II of the ADA and Section 504 of the Rehabilitation Act "by failing to create a policy requiring a tailored response by the deputies who were providing transport that would accommodate [Ms. Yang's] mental health disability and maintain her safety." Pl.'s Br. in Opp. at 26, Dkt. No. 51. "Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024) (quoting 42 U.S.C. § 12132). "Section 504 of the Rehabilitation Act provides: 'No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance.'" *Id.* (quoting 29 U.S.C. § 794(a)). Relief is "coextensive" under the acts, and "courts construe and apply the statutes in a consistent manner." *Id.* (citation modified); *see also A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (recognizing the "provisions and implementing regulations of the Rehabilitation Act and the ADA are 'materially identical'" (quoting another source)). The court will therefore consider the Estate's ADA and Rehabilitation claims together, referring to them collectively as "the Estate's disability discrimination claims" and relying on case law interpreting either statute interchangeably.

To succeed on a disability discrimination claim, a plaintiff must prove that "(1) he is a qualified person (2) with a disability and (3) the [defendant] denied him access to a program or activity because of his disability." *Jaros v. Ill. Dep't of Corr.*, 684 F.3d at 672 (7th Cir. 2012) (citing 29 U.S.C. § 705(2)(B)); *see also Lacy v. Cook County.*, 897 F.3d 847, 853 (7th Cir. 2018) (articulating materially identical test under Title II)). As noted above, the Rehabilitation Act also requires that the entity in question receive federal funds. 29 U.S.C. § 794(a); *Jaros*, 684 F.3d at 671–72. Here, the parties do not dispute that the County received federal funds for use in operating and maintaining the Outagamie County Jail. *See* Defs.' Resp. to Pls.' PFOF ¶ 102. The County also concedes that Ms. Yang was a qualified person with a disability; that is, her diagnosed acute psychosis impaired a major life activity. The court therefore narrows its analysis to the third element: denial of access to a program or activity because of disability.

As to the third element, "[w]hile the statutory language suggests that proof of disability discrimination requires intent, the statutes, corresponding regulations, and the Supreme Court have made clear that other methods of proving disability discrimination are available." *A.H. by Holzmueller*, 881 F.3d at 592. Specifically, the Seventh Circuit has recognized three alternative

avenues to proving the third element: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Id.* at 593; *see also Lacy*, 897 F.3d at 853 ("It is well established that a failure to make 'reasonable modifications in policies, practices, or procedures' can constitute discrimination under Title II." (quoting 28 C.F.R. § 35.130(b)(7)(i)).

The Estate's arguments to this point differ little, if at all, from its argument in support of its *Monell* claim against the County and fail for essentially the same reason. There is no evidence that the County itself had any policy that discriminated against Ms. Yang or denied her safe transport to a mental health facility. In fact, the County's policy for transporting mentally ill persons expressly required that the officers use "sufficient restraints . . . to insure the . . . individual's safety." Policy No. 202.04(B)(5). By its terms, the County's policy allows for the tailored response the Estate claims is required. To the extent that the Deputies did not follow that policy in failing to insure Ms. Yang's safe transport, there is no evidence that it was on account of or due to her disability. To the contrary, the record reflects that the Deputies were trying to accommodate Ms. Yang's disability by keeping her calm and making her comfortable.

In sum, the Estate has offered no evidence that either the Deputies or the County intentionally discriminated against Ms. Yang on account of her disability. Nor is there evidence that Ms. Yang was refused an accommodation she had requested. Finally, the County's policy does not disproportionately impact disabled persons. For these reasons, the County is entitled to summary judgment on the Estate's disability discrimination claims, and those claims will be dismissed.

**D.      State Law Claims**

The Estate has also asserted state-law wrongful death and indemnification claims. Consistent with the general rule that when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims, 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009), Defendants sought dismissal of those claims without prejudice upon their motion for summary judgment being granted on the federal claims. Since one of the Estate's federal claims survives, Defendants' motion as to the state law claims is denied.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. No. 31) is **DENIED in part** and **GRANTED in part**.  The motion is denied as to the Estate's Fourteenth Amendment claim against the Deputies and the state law claims.  It is granted as to the Estate's Fourteenth Amendment, ADA, and Rehabilitation Act claims against the County.  The Clerk is directed to place this matter on the court's calendar for a telephone scheduling conference.

**SO ORDERED** at Green Bay, Wisconsin this 1st day of July, 2025.

William C. Griesbach
United States District Judge